UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MICHAEL R. LANGLEY, | ) | NO. CV 06-5637-MAN |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM OPINION |
| v. | ) | |
| | ) | AND ORDER |
| MICHAEL J. ASTRUE,[1] | ) | |
| Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————————— | ) | |

Plaintiff filed a complaint on September 11, 2006, seeking review of the denial by the Social Security Commissioner ("Commissioner") of Plaintiff's claim for disability insurance benefits ("DIB").  On October 11, 2006, the parties consented to proceed before the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  The parties filed a Joint Stipulation on June 20, 2007, in which:  Plaintiff seeks an order reversing the Commissioner's decision and directing the payment of benefits or, alternatively, remanding the case for a new hearing; and

---

[1]    Michael J. Astrue became the Commissioner of the Social Security Administration on February 12, 2007, and is substituted in place of former Commissioner Joanne B. Barnhart as the Defendant in this action.  (*See* Fed. R. Civ. P. 25(d)(1); Section 205(g) of the Social Security Act, last sentence, 42 U.S.C. § 405(g).)

Defendant requests that the Commissioner's decision be affirmed.   The Court has taken the parties' Joint Stipulation under submission without oral argument.

### SUMMARY OF ADMINISTRATIVE PROCEEDINGS

Plaintiff filed his application for DIB on March 17, 2000. (Administrative Record ("A.R.") 46-48, 419.)  Plaintiff claims to have been disabled since February 9, 1999, due to right knee pain, bilateral carpal tunnel syndrome, a history of wrist fracture, neck pain, lower back pain, hearing loss, and right shoulder and arm pain.   (A.R. 75, 420.)   He has past relevant work experience as a parts clerk and a school bus driver.  (A.R. 420.)

The Commissioner denied Plaintiff's DIB claim initially and upon reconsideration.  (A.R. 31-32.)  On November 21, 2001, Plaintiff, who was represented by counsel, testified at a hearing before Administrative Law Judge Sandra K. Rogers ("ALJ Rogers").  (A.R. 449, 486-515.)   On January 29, 2002, ALJ Rogers denied Plaintiff's claim, and the Appeals Council subsequently denied Plaintiff's request for review of that decision.  (A.R. 11-20, 6-7.)  On March 10, 2003, Plaintiff brought an action in the United States District Court for the Central District of California, which was assigned Case No. CV 03-1613-MAN.  On February 13, 2004, pursuant to the parties' stipulation,[2] the undersigned United

---

[2]    The parties stipulated that:  in the new hearing, the hypothetical to be presented to the vocational expert must accurately reflect the limitations in the residual functional capacity finding; and, for purposes of the hypothetical, the "limitation 'no bending of the spine' is not the same as 'repetitive bending.'" (A.R. 463-64.)

States Magistrate Judge remanded the case to the Commissioner for further administrative proceedings, including a new hearing and decision.  (A.R. 463-66.)

On April 22, 2004, the Appeals Council vacated the January 29, 2002 decision of ALJ Rogers and remanded the case to a different Administrative Law Judge, with directions.  (A.R. 470-71.)  A second hearing was held before Administrative Law Judge Richard A. Urbin ("ALJ") on December 13, 2005. (A.R. 420, 920-79.)  Plaintiff was represented by counsel and testified at that hearing.  (*Id.*)  On June 27, 2006, the ALJ  denied Plaintiff's claim for DIB.  (A.R. 419-432.)

### SUMMARY OF ADMINISTRATIVE DECISION

In his June 27, 2006 opinion, the ALJ found that Plaintiff had engaged in substantial gainful activity since his alleged disability onset date of February 9, 1999.  (A.R. 421, 431.)  However, as an alternative to resolving Plaintiff's claim at step one, the ALJ elected to proceed with the remainder of the sequential analysis.  (A.R. 421.)  The ALJ found that Plaintiff had a combination of severe impairments, namely: osteopenia and degenerative disc disease of the lumbosacral spine, degenerative disc disease of the cervical spine, diverticulosis, a chronic compression deformity of a thoracic vertebrae, obesity, and hypertension.[3]  (A.R. 422-23, 431.)  The ALJ determined that none of

---

[3]    The ALJ also found that Plaintiff had suffered from impingement syndrome of the right shoulder (status post subacromial decompression).  (A.R. 423, 431.)  This syndrome constituted part of the combination of severe impairments until June 19, 2003, when it was resolved.  (*Id.; see also* A.R. 426)

these impairments, either individually or in combination, met the requirements for impairments listed at 20 C.F.R., Part 404, Subpart P, Appendix 1.  (A.R. 423, 431.)

The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to:  lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk six hours and sit six hours in an eight-hour workday; occasionally climb ladders, ropes and scaffolds, stoop, and crouch; and, prior to June 19, 2003, "occasionally push and/or pull overhead controls and reach overhead with the right upper extremity."  (A.R. 428, 431.)  The ALJ found that, by June 19, 2003, Plaintiff had no restrictions on the use of his right upper extremity.  (*Id.*)  The ALJ further found Plaintiff's assertions of greater limitations, and an inability to work, to be "not wholly credible." (A.R. 428, 431.)

The ALJ determined that Plaintiff's RFC did not preclude him from performing his past relevant work as a parts clerk or school bus driver, as such jobs actually were performed by Plaintiff.  (A.R. 430-31)  The ALJ also found that Plaintiff's medically determinable impairments would not prevent him from performing this past relevant work.  (A.R. 431.) The ALJ, therefore, concluded that Plaintiff was not disabled, as defined by the Social Security Act, during the relevant time period. (A.R. 432.)

**STANDARD OF REVIEW**

This Court reviews the Commissioner's decision to determine

whether it is free from legal error and supported by substantial evidence. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1279 (9th Cir. 1996). The Commissioner's decision must stand if it is supported by substantial evidence and applies the appropriate legal standards. <u>Saelee v. Chater</u>, 94 F.3d 520, 521 (9th Cir. 1996). Substantial evidence is "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." <u>Moncada v. Chater</u>, 60 F.3d 521, 523 (9th Cir. 1995).

Although this Court cannot substitute its discretion for that of the Commissioner, this Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion." <u>Desrosiers v. Sec'y. of Health and Human Serv.</u>, 846 F.2d 573, 576 (9th Cir. 1988); *see also* <u>Jones v. Heckler</u>, 760 F.2d 993, 995 (9th Cir. 1985). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039-40 (9th Cir. 1995). This Court must uphold the Commissioner's decision if it is supported by substantial evidence and free from legal error, even when the record reasonably supports more than one rational interpretation of the evidence. *Id*. at 1041; *see also* <u>Morgan v. Comm'r. of the Soc. Sec. Admin.</u>, 169 F.3d 595, 599 (9th Cir. 1999); <u>Flaten v. Sec'y.</u>, 44 F.3d 1453, 1457 (9th Cir. 1995).

**DISCUSSION**

Plaintiff contends that the ALJ erred in his findings that Plaintiff: had engaged in substantial gainful activity after the

5

alleged onset of disability; could perform his past relevant work; and was not credible.   (Joint Stipulation ("Joint Stip.") at 5.)

A.   The ALJ's Substantial Gainful Activity Finding

The first step in the five step sequential analysis employed to make a disability determination under the Social Security Act requires the assessment of whether the claimant has engaged in substantial gainful activity since the alleged disability onset date.   Barnhart v. Thomas, 540 U.S. 20, 24, 124 S. Ct. 376, 379 (2003)("At the first step, the agency will find nondisability unless the claimant shows that he is not working at a 'substantial gainful activity.'")(citing 20 C.F.R. §§ 404.1520(b), 416.920(c)).   Substantial gainful activity is work that "[i]nvolves significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.   Work may be substantial even if it is part-time or involves less work and payment than previous work.  20 C.F.R. § 404.1572(a).   Work is gainful if it is the type of work usually done for pay or profit, regardless of whether profit is realized.  20 C.F.R. § 404.1572(b).

The ALJ based his step one finding on the following evidence of record:  On March 31, 2000, Plaintiff told a vocational evaluator that he had "already implemented" a business venture called Langley Farms. (A.R. 549.)   Plaintiff represented to the evaluator that he "had the capacity to work 40 hours per week" in this self-employment venture, where he would farm, treat, harvest, and sell pistachios.  (A.R. 549-50.)  Plaintiff further represented that he was "physically capable of performing 100% of the self-employment duties."  (A.R. 552.)  In 2001,

6

Plaintiff fell from a ten-foot ladder, which the ALJ characterized as "consistent with his business." (A.R. 421; *see* A.R. 679 (June 13, 2004 medical report).)  In January 2005, Plaintiff reported getting exercise from walking while he was at work; and in July 2005, he reported that he would "walk some in the morning when he is checking his pistachio trees." (A.R. 827, 851.)

Although Plaintiff testified that Langley Farms was not profitable, the ALJ determined that: (1) the physical nature of this venture constituted "substantial" activity; and (2) because the type of activity at issue was "usually done for pay or profit," it could be considered "gainful" regardless of profitability. (A.R. 421, *citing* 20 C.F.R. § 404.1572(a) and (b).)

In sum, the ALJ's finding that Plaintiff has engaged in substantial gainful activity since his alleged disability onset date rested on Plaintiff's March 2000 assertions to a vocational evaluator regarding his planned operation of "Langley Farms" and Plaintiff's 2005 statements to health professionals describing a 2001 injury and his exercise efforts. (A.R. 421.)  The conclusions the ALJ drew from this evidence, when viewed in the totality of the record, were erroneous.

The ALJ determined that Plaintiff already was operating Langley Farm as of February 9, 1999, his claimed onset date, and was continuing to do so through the time of the 2005 hearing.  While the evidence supports the first finding, it does not support the latter.  At his 2001 hearing before ALJ Rogers, Plaintiff testified that the Langley Farms business lasted from 1980 until 2000, but he "had to stop" because he

"couldn't do the work on it anymore." (A.R. 396.) Plaintiff explained that he no longer could prune and dig "to plant the trees and stuff, anymore." (A.R. 396.) Plaintiff stated that he still owned the land, but leased it out and lived there part-time. (*Id.*) At the 2005 hearing, in response to the ALJ's question about when Plaintiff stopped the farm's business, Plaintiff testified that he "had to give" up the farm business "[w]hen [he] got hurt" while working at his school employment, because he no longer could "do the bending and stuff" needed to "work the trees." (A.R. 929; *see also* A.R. 931-32.) That injury apparently occurred in February 1999, on two occasions, when Plaintiff attempted to restrain some students. (*See* A.R. 639 (indicating a shoulder injury on February 9, 1999, and a low back injury on February 26, 1999).) The ALJ then noted Plaintiff's earlier-described March 2000 representations to the vocational evaluator about his plans to run Langley Farms, and again asked Plaintiff, "when did you become unable to manage the property?" Plaintiff responded: "When, when I did -- got the surgery -- when they broke my vertebrae and I had the surgery, after that I couldn't do it anymore." (A.R. 932.)

With respect to Plaintiff's 2001 fall from a ten-foot ladder, Plaintiff testified that this occurred while he was checking a water tank on the farm property -- a tank that held water for his personal use at his residential trailer on the property -- and he lost his balance when the ladder went into the dirt. (A.R. 933-34.) As Plaintiff explained, he needed to make sure the water tank was full, because: "I've got to fill the tank up so I'd have water for the trailer to take showers and stuff." (A.R. 934.) Plaintiff responded "no" when the ALJ asked him if the farm was still operational in 2001, and Plaintiff

explained that he had stopped watering the pistachio trees in 1999 or 2000, because he no longer could afford the electricity bill for doing so. (A.R. 934-36.) Thus, the ALJ's statement that Plaintiff did not specify the reason he fell from the ladder and the ALJ's conclusion that the 2001 ladder fall was "consistent" with Plaintiff continuing to operate Langley Farms as an ongoing business (A.R. 421) were contrary to the evidence and unreasonable.

With respect to Plaintiff's 2005 statements to health personnel that he exercised by walking among the farm's trees, Plaintiff testified that, even though the farm was not operational, he still needed to check the trees for "bugs and stuff," because he hoped to keep the trees alive should, in the future, he obtain enough money to recommence watering them and re-start farm operations. (A.R. 934, 936.) Moreover, given that Plaintiff's comments about exercise were made to the clinical dietician treating him in connection with his weight loss efforts, who had advised Plaintiff to "[c]ontinue to exercise as able" (A.R. 855), the ALJ's construction of such comments as proof that Plaintiff was continuing to run Langley Farms -- particularly in the face of Plaintiff's testimony that the business had ceased operations years earlier -- was inappropriate. The ALJ's conclusion that these exercise efforts by Plaintiff somehow proved that Plaintiff "was still operating the farm in 2005," again, was unreasonable.

Plaintiff's March 2000 statements that he had the capability to work 40 hours, and to perform 100% of the self-employment duties, at Langley Farms (A.R. 550, 552) also are not sufficient to support the ALJ's finding that Plaintiff actually had engaged in substantial gainful

9

activity throughout the period in question, *i.e.,* since February 9, 1999, and through 2005. The statements on which the ALJ relies were prospective at best, and simply reflected Plaintiff's indication at that time of what he hoped or intended to do *in the future* with respect to Langley Farms, not what he already was doing. (A.R. 548-52.) Plaintiff's statements as to his future goals do not evidence any existing, ongoing substantial gainful activity during the period in question. Moreover, the evidence of record establishes that those goals were not met, given Plaintiff's testimony that he leased out the farmland and had not had any pistachio crop since 1999 or 2000, when he stopped watering the trees. (A.R. 936.)

In short, the evidence relied on by the ALJ to support his conclusion that Plaintiff operated Langley Farms throughout the period in question was not substantial. The record, as a whole, does not contain sufficient evidence to establish that Plaintiff performed substantial physical or mental activities in anticipation of profit, as described in 20 C.F.R. § 404.1572. Accordingly, the ALJ's first alternate finding, and his denial of Plaintiff's claim at step one, was erroneous and is reversed.

B.  The ALJ's Finding That Plaintiff Can Perform His Past Relevant Work

Plaintiff contends that the ALJ's finding that Plaintiff can perform his past relevant work is flawed in two respects. First, Plaintiff asserts that the ALJ erred by failing to accept the January 11, 2000 opinion of Plaintiff's treating physician, Dr. David Hang, that

10

Plaintiff could not perform work at or above shoulder level with his right arm. Plaintiff contends that the ALJ failed to provide specific and legitimate reasons for rejecting this opinion, and that the right arm limitations expressed by Dr. Hang in January 2000, should govern for the period of disability up to June 19, 2003. Second, Plaintiff contends that the ALJ improperly rejected the opinion of his chiropractor, Isobel Amorim, on the asserted ground that her opinion conflicted with the weight of opinion from other acceptable medical sources.

Before determining disability, the ALJ must evaluate all the relevant evidence, including medical opinions. 20 C.F.R. § 404.1527. Although not binding on the Commissioner with respect to the ultimate issue of disability, a treating physician's opinion is "generally afforded the greatest weight in disability cases." Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001). A treating physician's opinion generally is entitled to greater weight than those of examining or non-examining physicians because "treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual." Edlund v. Massanari, 253 F.2d 1152, 1157 (9th. Cir. 2001); see also 20 C.F.R. § 404.1527(d)(2); Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, *1-*2. If contradicted by another doctor, a treating or examining source opinion may be rejected only for specific and legitimate reasons that are based on substantial evidence in the record. Batson v. Commissioner of Social Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); Tonapetyan, 242 F.3d at 1148.

Unlike physicians, chiropractors are not "acceptable medical

11

sources" as defined by the social security regulations, and chiropractor reports are, instead, "information from other sources" that may be considered.  *See* 20 C.F.R. § 404.1513(a) & (d); Diaz v. Shalala, 59 F.3d 307, 312-14 (2d Cir. 1995).  While the regulations, in 20 C.F.R. § 404.1527, provide specific guidelines for assessing conflicting opinions from acceptable medical sources, they contain "no specific guidelines for the weighing of opinions from other sources." Gomez v. Chater, 74 F.3d 967, 970 (9th Cir, 1996).  However, on August 9, 2006, SSR 06-3p was published for the stated purpose of clarifying how the Social Security Administration ("SSA") treats opinions from other sources. 2006 WL 2329939, at *1.  SSR 06-3p has been stated to be a "clarification of existing SSA policies." Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007).  The ruling, thus, has been found to be applicable to determinations of the Commissioner made before the ruling issued.  Bowman v. Astrue, 511 F.3d 1270, 1275 (10th Cir. 2008).

In SSR 06-3p, the SSA stated that the following factors are relevant to weighing opinion evidence from other sources:  how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty or area of expertise related to the individual's impairment(s); and any other factors that tend to support or refute the opinion.  2006 WL 2329939, at *4-*5.  As SSR 06-3p confirms, other source opinion, such as that of a chiropractor, may serve as evidence to show the severity of an impairment, or the extent to which an impairment impacts a claimant's ability to work.  *See also* 20 C.F.R. § 404.1513(d).

With these principles in mind, the Court examines the two medical opinions in question, and the ALJ's treatment of them.

*Dr. Hang:*

Following his February 1999 injuries, Plaintiff was treated by Dr. Hang as a workers compensation provider.  Dr. Hang began treating Plaintiff on April 27, 1999.  (A.R. 159.)  Based on his examination of that date, Dr. Hang diagnosed Plaintiff with cervical spine muscle strain, right shoulder bursitis, right tennis elbow, lateral epicondylitis, and right lumbosacral spine strain.  (A.R. 162.)  On June 22, 1999, Dr. Hang noted that Plaintiff still had some low back pain and persistent right shoulder pain.  (A.R. 155.)  On that same date, as well as on August 13, 1999, October 19, 1999, November 16, 1999, and December 14, 1999, Dr. Hang stated his clinical impressions to be healed lateral epicondylitis, lumbosacral spine strain on the right side, and bicipital tendinitis.  (A.R. 147, 149, 151, 153, 155.)  On August 13, 1999, Plaintiff reported to Dr. Hang that the pain in his right shoulder had improved, but he still experienced "some tingling sensation especially with overhead forward activities."  (A.R. 153.)  However, on December 14, 1999, Plaintiff reported that he was experiencing increasing pain in the right shoulder.  (A.R. 147.)

On January 11, 2000, Dr. Hang issued a report finding that Plaintiff had made the maximum recovery, and his condition was then permanent and stationary.  (A.R. 234.)  He noted that Plaintiff was "complaining of some increasing pain in the right shoulder, in the anterolateral aspect of the shoulder, as well as with overhead

13

activities." (A.R. 232.) Dr. Hang described Plaintiff's subjective complaints as "in the range of intermittent to minimal with repetitive use of his shoulder for at or above shoulder activities or with repetitive heavy lifting, pushing, pulling." (A.R. 234.) Dr. Hang assessed a work restriction that Plaintiff, inter alia, be: "restricted from repetitive use of his right upper extremity for *at or above shoulder activities*, as well as repetitive heavy lifting, pushing, pulling"; and "restricted from lifting objects which will weigh more than 10-15 pounds." (*Id.*; emphasis added.)

On March 31, 2000, Dr. Hang issued an Addendum to his January 11, 2000 report, "to clarify some of the questions that were raised" based on the January report. (A.R. 139.) Dr. Hang stated that, with respect to Plaintiff's subjective complaints regarding his shoulder, "the frequency of the pain is occasional with repetitive use of the shoulder for at or above shoulder activities including repetitive lifting, pushing or pulling, and the degree of pain is also described as minimal and again with repetitive use of the shoulder." (*Id.*) Dr. Hang stated his work restrictions to be: "the restriction is indicated for the right upper extremity which means that the patient cannot lift more than 10-15 pounds at a time, and also that this should not be *for above the shoulder level activities*"; and "in terms of the lumbar spine, the patient also will not be able to perform heavy lifting more than 10-15 pounds especially with bending his spine." (*Id.*; emphasis added.)

On June 22, 2000, a state agency physician, Dr. Ronald M. Moore, reviewed the medical evidence and opined that Plaintiff, *inter alia*: could lift 20 pounds occasionally and 10 pounds frequently; and as to

14

his right upper extremity, was limited to only occasional pushing and pulling of overhead controls and overhead reaching.  (A.R. 190, 192.) Dr. Moore did not view the differences in the weight-bearing he had assessed versus that assessed by Dr. Hang to be "significantly different," and otherwise considered their opinions to be consistent. (A.R. 195.)  On September 20, 2000, another reviewing physician, Dr. Sadda Reddy, viewed and agreed with Dr. Moore's opinion, finding the "manipulative limitations to right upper extremity to avoid repetitive overhead work" to be appropriate and consistent with Dr. Hang's opinion "with minimal differences."  (A.R. 196, 198.)

At the 2005 hearing, the ALJ propounded a hypothetical to the vocational expert ("VE") based on Dr. Moore's opinion.  The VE opined that the claimant could perform Plaintiff's prior jobs of bus driver and parts clerk as he stated he had performed them.  (A.R. 963.)  The ALJ then directed the VE to add to that hypothetical "Dr. Hang's opinion from Exhibit 19F, that with the right upper extremity the claimant could not lift more than 10 to 15 pounds with the right upper extremity and could not lift the arm above shoulder level."[4]  (A.R. 963-64.)  The VE opined that the claimant still could perform Plaintiff's prior bus driver and parts clerk positions as he stated they had been performed. (A.R. 964.)  Plaintiff's counsel then asked the VE to assume a limitation of "no more than occasional use of the right upper extremity either at or above shoulder level."  (A.R. 966.)  The VE opined that, with the addition of the limitation on use of the right upper extremity

---

[4]    While Plaintiff characterizes this direction as "mischaracterizing" Dr. Hang's opinion (Joint Stip. at 11), in fact, the ALJ's description was consistent with Dr. Hang's January 11, 2000 opinion as it was modified by his March 31, 2000 "addendum."

"at" shoulder level, the claimant could not perform either the bus driver or parts clerk jobs, because both involved driving and the need to use both hands on the wheel.  (A.R. 967.)

In his decision, the ALJ found, consistently with the state agency physician opinions, that Plaintiff retained the RFC to lift and/or carry 20 pounds occasionally and 10 pounds frequently.  The ALJ found that, prior to June 19, 2003, Plaintiff was limited in his right upper extremity to occasional pushing and/or pulling overhead controls and reaching overhead, but that this limitation was eliminated following June 19, 2003.  (A.R. 431.)  The ALJ rejected Dr. Hang's opinion of March 31, 2000, that Plaintiff cannot lift more than 10 to 15 pounds and not above the shoulder level.  (A.R. 428, *citing* Ex. 19F, p. 2, which contains the March 31, 2000 opinion.)  The ALJ stated three reasons for rejecting Dr. Hang's opinion.  First, the ALJ noted that Dr. Hang had not seen Plaintiff since January 11, 2000.  Second, the ALJ reasoned that Dr. Hang's opinion contradicted the SSA's opinion "that a one-armed individual can still lift and/or carry 20 pounds (Social Security Ruling 83-12; 20 CFR 404.1567). . . ."  Third, the ALJ reasoned that Dr. Hang's opinion is inconsistent with the SSA's opinion that "most jobs at the sedentary and light level do not require bending of the spine (Social Security Rulings 83-14 and 85-15).  (A.R. 428.)

Plaintiff argues that the ALJ should have adhered to Dr. Hang's limitations set forth in his January 11, 2000 opinion -- *to wit*, that Plaintiff be "restricted from repetitive use of his right upper extremity for *at or above shoulder activities*" -- and failed to state specific and legitimate reasons for not doing so.  He asserts that

16

neither the SSRs nor the regulation cited by the ALJ regarding the SSA's opinions and policies justify the ALJ's rejection of Dr. Hang's January 2000 opinion.   Plaintiff further argues that, under <u>Cherukuri v. Shalala</u>, 175 F.3d 446, 453 (6th Cir. 1999), it was improper for the ALJ to rely on the opinions of non-examining state agency physicians in place of the opinion of a treating physician.   (Joint Stip. at 9-12.)

As a threshold matter, Plaintiff's arguments rest on the false premise that Dr. Hang's "opinion" exists only as set forth in his January 11, 2000 report, and specifically, directed a right upper extremity restriction on "at or above" shoulder activities.   Plaintiff ignores the fact that Dr. Hang, on March 31, 2000, explicitly clarified and modified his January 11, 2000 opinion, and revised the right upper extremity restriction to apply to activities "above the shoulder level," rather than the earlier-stated and broader restriction of activities "at or above [the] shoulder."   (A.R. 710, 718.)   Hence, the ALJ appropriately looked to Dr. Hang's revised opinion as of March 31, 2000, and its "above the shoulder level" restriction, both when propounding a hypothetical to the VE[5] and when assessing the evidence of record. Plaintiff's apparent contention that the ALJ should have ignored Dr. Hang's March 31, 2000 clarification/modification of his earlier opinion and adhered to the earlier "at or above shoulder" restriction is unpersuasive.

When that threshold error in Plaintiff's analysis is accounted for,

---

[5]   Plaintiff's contention (Joint Stip. at 11) that the ALJ "mischaracteriz[ed] Dr. Hang's opinion in the hypothetical to the VE is simply wrong.

Plaintiff's complaint, boiled down, is that the ALJ should have accepted Dr. Hang's direction of a lifting restriction of 10 to 15 pounds, rather than finding a lifting limitation of 10 to 20 pounds, as found by the state agency physicians, to be appropriate.[6]   The ALJ made that determination after examining the relevant evidence of record (A.R. 426-28), which included the following:

Shortly after Plaintiff's February 1999 injuries, in early March 1999, an Alhambra Hospital physician opined that Plaintiff was limited to sedentary work, *i.e.,* lifting no more than 10 pounds. (A.R. 426, *citing* A.R. 644, 646.)   Later that same month, Dr. Robert Ghatan, a treating physician, opined that Plaintiff was precluded from lifting, pushing, and  pulling with his right upper extremity for approximately two weeks. (A.R. 426, *citing* A.R. 637-38.)   In January and March 2000, Dr. Hang opined that Plaintiff was restricted from lifting over 15 pounds. (A.R. 427, *citing* A.R. 139, 145, 710, 718.)   The state agency physicians opined in June and September 2000, that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently. (A.R. 427, *citing* A.R. 190, 198.)   In November 2002, Dr. Amorim opined that Plaintiff could lift 10 and 20 pounds occasionally and less than 10 pounds frequently. (A.R. 427, *citing* A.R. 598.)   On August 5, 2004, Dr. Ghatan (who had not seen Plaintiff since November 1999) opined that Plaintiff could lift

---

[6]   The 10 to 20 pounds restriction is consistent with "light work."  20 C.F.R. § 404.1567(b) ("light work" involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds").

Dr. Hang's 10 to 15 pounds restriction is nominally less than "light work," but greater than "sedentary work."  20 C.F.R. § 404.1567(a) ("sedentary work" involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools").

and/or carry 50 pounds occasionally and 25 pounds frequently. (A.R. 427-78, *citing* A.R. 704-708.)

After reviewing this evidence, the ALJ accepted the assessment of the state agency physicians as to the 10/20 pounds lifting restriction. The ALJ "gave the claimant the benefit of the doubt" and rejected Dr. Ghatan's 25/50 pounds lifting restriction, noting that Dr. Ghatan had not seen Plaintiff since November 1999, as well as the physician's earlier right upper extremity restriction. (A.R. 427-28.) The ALJ rejected Dr. Amorim's lifting restriction of less than 10 pounds frequently, because this finding equated to a determination that Plaintiff was limited to performing less than sedentary work, which conflicted with the weight of opinion from acceptable medical sources. (A.R. 427.) Finally, the ALJ rejected the five-pound differential of Dr. Hang's opinion as to occasional lifting,[7] as noted above. (A.R. 428.) The question is whether the ALJ's stated reasons for this five-pound differential were specific and legitimate.

The ALJ concluded that Dr. Hang's 10/15 pounds lifting restriction, to the extent it was based on Plaintiff's right shoulder injury, was "inconsistent" with the SSA "opinion" embodied in SSR 83-12 that even a one-armed person can lift or carry 20 pounds. (A.R. 428.) SSR 83-12 is a Program Policy Statement addressed to RFC findings that do not coincide with any of the defined exertional ranges of work. 1983 WL 31253, *1. The SSR, among other things, addresses the "special

_____

[7]     The state agency physicians and Dr. Hang were in agreement that Plaintiff could lift 10 pound frequently.  The difference in their respective opinions amounts to a restriction of 20 pounds occasionally (state agency physicians) versus 15 pounds occasionally (Dr. Hang.)

situation" of "loss of use of an upper extremity," and notes that typically, an amputation above the elbow would limit a person to light work activity with additional limitations due to loss of bimanual manipulation and problems with handling bulky objects, rather than a limitation to sedentary work, which often requires "good use of both hands." *Id.* at *4. The SSR also notes the likely erosion of total number of occupations when use of an upper extremity is lost, and that the typical potential occupational base will be between those existing for sedentary work and light work. *Id.* Here, Plaintiff had not actually lost the use of his right upper extremity entirely and, moreover, retained the use of a fully-functioning upper left extremity. The ALJ's reference to the SSA's policy finding that persons with only one functioning arm often can perform light work, because they can lift 20 pounds occasionally with their remaining good arm, was informative and constituted an appropriate basis for rejecting Dr. Hang's opinion otherwise.

The ALJ rejected Dr. Hang's 10/15 pounds lifting limitation, to the extent it was premised on Plaintiff's lumbar spine injury and the need to avoid bending the spine, on the additional basis that most jobs at the sedentary and light work levels do not require bending of the spine, citing SSRs 83-14 and 85-15. (A.R. 428.) Plaintiff argues that this finding was not legitimate, because in another ruling (SSR 96-9p), the SSA has opined that an inability to engage in stooping significantly erodes the occupational base for sedentary work. (Joint Stip. at 12.) Whether or not this is the case, Dr. Hang did not opine that Plaintiff is unable to stoop, did not impose any restriction precluding bending of the spine, and, rather, simply noted that Plaintiff reported

experiencing slight to moderate lumbar spine pain on an intermittent to frequent basis brought on by, among other things, repetitive bending. (A.R. 710.)   Accordingly, Plaintiff has not shown that this reason stated by the ALJ was improper.

Finally, Plaintiff argues that it was inappropriate for the ALJ to reject Dr. Hang's lifting restriction in favor of that expressed by the state agency physicians on the basis that Dr. Hang had not treated Plaintiff since January 11, 2000.   Plaintiff reasons that the state agency physician opinions, rendered in June and September 2000, were "similarly situated" to that of Dr. Hang, and thus, it was improper to rely on them, based on the Sixth Circuit's decision in Cherukuri, 175 F.3d at 453.   (Joint Stip. at 12.)   Plaintiff's reliance on the Cherukuri case is puzzling, given its utter lack of relevance in this Social Security action.[8]   That reliance is further puzzling given the well-established Ninth Circuit precedent that permits reliance on non-examining physician opinions as substantial evidence, even if contrary to treating physician opinions, when they are consistent with other medical evidence of record.   See, e.g., Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002)("The opinions of non-treating or non-examining

_____

[8]   In Cherukuri, the Sixth Circuit set aside the Department of Health and Human Services's imposition of a civil penalty against an emergency room physician based on his alleged failure to stabilize patients prior to their transfers in violation of the Emergency Medical Treatment and Active Labor Act.   At the page cited by Plaintiff, the Sixth Circuit found that an administrative law judge had erred in ruling out the testimony of several doctors/defense witnesses on the ground that their testimony was based solely on patient record review rather than patient observation, when the administrative law judge, inconsistently, had accepted similar testimony from doctors/government witnesses based solely on record reviews rather than patient observations.   175 F.3d at 453.   No such inconsistent treatment, however, occurred in this case.

physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record."); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1148 (9th Cir. 2001) ("Although the contrary opinion of a non-examining medical expert does not alone constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, it may constitute substantial evidence when it is consistent with other independent evidence in the record.")(*citing* <u>Magallanes v. Bowen</u>, 881 F.2d 747, 752 (9th Cir.1989)); <u>Andrews</u>, 53 F.3d at 1040-41. The state agency physicians considered their opinions to be consistent with Dr. Hang's opinion, with the exception of the five-pound differential in the occasional lifting restriction, a difference characterized as "minimal." (A.R. 195-96, 198.) Given the ALJ's other stated reasons for rejecting Dr. Hang's imposition of a 15-pound occasional lifting restriction and the otherwise consistent nature of the state agency physician opinions, and given that their imposition of a 20-pound occasional lifting restriction was consistent with the medical evidence of record, Plaintiff's final argument of error is not persuasive.

For the reasons set forth above, the Court concludes that the ALJ did not commit reversible error with respect to his consideration of Dr. Hang's opinion.

*Dr. Amorim:*

Dr. Amorim, Plaintiff's chiropractor, opined that Plaintiff's capacity for work was limited to less than sedentary work. In her November 2002 Physical Residual Capacity Questionnaire, she opined that

Plaintiff:  can walk only one-half block without needing to rest; can continuously sit and/or stand for only one hour; can sit or stand/walk less than two hours total in an eight-hour workday; must walk at least five minutes every hour; must have unscheduled hourly rest breaks of five minutes every hour; can frequently lift less than 10 pounds; can occasionally lift ten and 20 pounds; and can reach with his arms, including overhead, only 10% of the eight-hour workday.  (A.R. 595-99.) Plaintiff asserts that the ALJ's stated reasons for rejecting Dr. Amorim's opinion -- that it conflicted with the weight of opinion from acceptable medical sources (A.R. 427) -- was not legitimate under SSR 06-3p.  (Joint Stip. at 13-14.)

     As Plaintiff notes, under SSR 06-3p, among the factors to be considered when assessing "other source" evidence is the length of the treating relationship and the frequency of treatment.  The ruling also, however, lists as a salient factor "how consistent the [other source] opinion is with other evidence."  2006 WL 2329939, at *4.  In addition, the ruling expressly preserves the concept of the hierarchy of medical opinion evidence.[9]  Thus, the ALJ's stated basis for rejecting Dr. Amorin's opinion, *viz.*, that it conflicted with the weight of opinion from "acceptable medical sources," was appropriate under SSR 06-3p, and therefore legitimate, if it is supported by the record.

     Dr. Amorim posited limitations that were substantially more extreme than those posited by any of the treating and non-treating physicians,

_____

[9]     "The fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source'[.]"  SSR 06-03p, 2006 WL 2329939, at *5.

as described above.  No doctor opined, as did Dr. Amorim, that Plaintiff was incapable of lifting ten pounds frequently, or of sitting, standing, or walking for longer than two hours in an eight-hour workday, or was unable to walk more than a half-block without resting or needed to take hourly rest breaks, or was restricted in the use of his left upper extremity.  Indeed, no physician opined that Plaintiff was limited to less than sedentary work.  Moreover, Dr. Amorim's opinion is inconsistent with Plaintiff's own testimony.  Plaintiff testified that he walked up to ten to 12 miles daily over the course of a day and stops to rest after a mile.  (A.R. 938-39.)  Plaintiff also testified that he can reach overheard and push and pull with his left arm, and did not allege the substantial reaching restriction posited by Dr. Amorim. (A.R. 958.)

The ALJ, consistently with SSR 06-3p, concluded that Dr. Amorim's opinion should be rejected, because it conflicted with the weight of medical evidence.  This finding was appropriate, specific, and legitimate.  Neither SSR 06-03p, nor case law, requires a different outcome.  Accordingly, the ALJ did not err in his treatment of Dr. Amorim's opinion.

Plaintiff's arguments as to the ALJ's finding that Plaintiff can perform his past relevant work are not persuasive.  Hence, Plaintiff's related argument -- namely, that if Dr. Hang's January 11, 2000 opinion had been accepted, Plaintiff should have been found disabled as of March 6, 2003, his 55th birthday (Joint Stip. at 14) -- also fails.  As described above, the VE testified that a person with the limitations expressed by *either* the state agency physicians or Dr. Hang as set forth

24

in his March 11, 2000 addendum opinion could perform Plaintiff's past relevant work as he stated it was performed.  Hence, reversal based on this issue is not warranted.

C.  <u>The ALJ's Credibility Finding</u>

Once a disability claimant produces evidence of an underlying physical impairment that is reasonably likely to be the source of his subjective symptom, the subjective testimony as to the severity of the symptoms must be considered.  <u>Moisa v. Barnhart</u>, 367 F.3d 882, 885 (9th Cir. 2004); <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 345 (9th Cir. 2001)(*en banc*); *see also* 20 C.F.R. § 404.1529(a) (explaining how pain and other symptoms are evaluated).  "Unless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each."  <u>Robbins v. Social Sec. Admin.</u>, 466 F.3d 880, 883 (9th Cir. 2006); *see* <u>Smolen</u>, 80 F.3d at 1283-84 ("Once a claimant meets the *Cotton* test [<u>Cotton v. Bowen</u>, 799 F.2d 1403, 1407 (9th Cir. 1986)] and there is no affirmative evidence suggesting she is malingering, the ALJ may reject the claimant's testimony regarding the severity of her symptoms only if he makes specific findings stating clear and convincing reasons for doing so."); *see also* <u>Lester v. Chater</u>, 81 F.3d 821 (9th Cir. 1996).  Further, the ALJ's credibility findings must be "sufficiently specific" to allow a reviewing court to conclude that the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony.  <u>Moisa</u>, 367 F.3d at 885.  If the ALJ's interpretation of the claimant's testimony is reasonable and is

25

supported by substantial evidence, it is not the court's role to "second-guess" it. <u>Rollins v. Massanari</u>, 261 F. 3d 853, 857 (9th Cir. 2001).

The ALJ noted that Plaintiff "alleges greater limitations" than the RFC found by the ALJ, and that Plaintiff "contends that he cannot work." (A.R. 428.)  The ALJ found "not wholly credible" Plaintiff's subjective complaints for three reasons:  Plaintiff appeared to overstate his symptoms and limitations ("Reason One"); Plaintiff's reported activities are inconsistent with his assertion that he is disabled ("Reason Two"); and Plaintiff's desire to obtain DIB appeared to be "more motivated by financial concerns rather than physical concerns" ("Reason Three"). (A.R. 428-29, 431.)

*Reason One:*

With respect to the ALJ's first reason for his adverse credibility finding, *viz.*, Plaintiff asserted overstatement of his symptoms and limitations, the ALJ first noted that, although Plaintiff alleged disability based on right shoulder pain, there was no evidence he had sought treatment for right shoulder pain since June 2003, following his surgery. (A.R. 429.)  Plaintiff contends that this reason is not legitimate, because Plaintiff "made no complaints of shoulder dysfunction at the hearing on December 13, 2005." (Joint Stip. at 34.) Plaintiff's contention is incorrect.

When Plaintiff applied for DIB, he claimed an inability to work due to, *inter alia*, right shoulder pain. (A.R. 75.)  At the 2001 hearing

26

before ALJ Rogers, Plaintiff testified that he could not do his prior parts clerk job, because he could not raise his right arm above an unspecified level and, thus, could not use the arm to load parts into the truck. (A.R. 402.) Plaintiff had right shoulder surgery in April 2003. (A.R. 943-44.) At the 2005 hearing, Plaintiff's counsel stated at the outset that Plaintiff was disabled, because he "has severe injuries" and is "not able to use his right dominant arm at or above shoulder level." (A.R. 922.) Plaintiff testified about his current right shoulder pain and his resulting limitations. (*See* A.R. 944 – stating that although the 2003 shoulder surgery resulted in an ability to lift his right arm above his shoulder, "I still have a lot of pain in it and stuff," and that pain occurs regardless of the level at which his arm is raised, although it is worse if the arm is raised above shoulder level; 945 – although Plaintiff takes the same medications for his right shoulder pain that he takes for his back pain, the shoulder pain is only minimally relieved; 958 – stating that although, due to the surgery, he can move his right arm above shoulder level, he cannot engage in any repetitive lifting of the right arm, cannot push and pull with the right arm, and has diminished strength in his right arm.)

In short, as of the 2005 hearing, Plaintiff continued to complain of substantial limitations on his ability to work based on his right shoulder pain. However, as the ALJ noted, the record indicated that Plaintiff has not sought treatment for his claimed right shoulder pain since his 2003 surgery. (A.R. 426 and 429, *citing* A.R. 670-703 (Kaiser treatment records of August 2, 2003, through December 19, 2003) and 755-890 (VA treating records from July 4, 2004, through August 17, 2005).) As the ALJ also noted: on June 19, 2003, following the right shoulder

27

surgery, Plaintiff demonstrated having a full range of motion of the right shoulder and reported that, although he had some "minor aches," he had experienced a 95% improvement (A.R. 422 and 426, *citing* A.R. 680); and in September 2004, Plaintiff demonstrated a full range of motion in the right upper extremity, with no evidence of atrophy or sensory deficits (A.R. 426, *citing* A.R. 883).   The ALJ's first reason for finding Plaintiff to be less than fully credible was specific and, based on the record, was clear and convincing.   This stated reason, thus, supports the ALJ's credibility finding.

The ALJ identified, as a second basis for his conclusion that Plaintiff overstated his symptoms and limitations, the inconsistency between Plaintiff's claim of disabling neck pain and his treatment records.   When he applied for DIB, Plaintiff alleged neck pain as a disabling condition.   (A.R. 75.)   At the 2001 hearing, Plaintiff testified that he could not work "[b]ecause of my back and my neck." (A.R. 389-90.)   Plaintiff testified that he had "a lot of problems with my neck," including "bad pressure and real bad headaches," which was why he visited a chiropractor.   (A.R. 394.)   Plaintiff stated that he visited the chiropractor four times a month, which was the maximum his insurance covered, and that the chiropractic visits relieved the pain only for two to three days at a time before "the pain gets real bad again."   (A.R. 395.)   Plaintiff stated that he did not see a doctor at Kaiser for the pain, because it stemmed from a work-related injury, which Kaiser did not cover.   (*Id.*)   At the 2005 hearing, neither the ALJ nor Plaintiff's counsel asked Plaintiff about neck pain, and the issue was not mentioned.   (A.R. 920-79.)

28

The ALJ notes that, although the record is replete with evidence of Plaintiff's ongoing chiropractic treatment for neck pain, the record does not show that Plaintiff sought treatment for his neck pain from Kaiser at all, and he sought such treatment on only one occasion (December 2004) from the VA.  (A.R. 429.)  As noted above, at the 2001 hearing, Plaintiff explained why he was not seeking treatment from Kaiser for his neck pain.  Given that Plaintiff was receiving chiropractic treatment for his neck pain, it is unclear why a failure to *also* seek such treatment from a different medical care provider, whether Kaiser or the VA, matters to his credibility.  The failure to seek what would appear to be duplicative care does not evidence any inconsistency.  To the extent the ALJ believed that Plaintiff's failure to seek treatment, in addition to the chiropractic care he received, was troubling, the ALJ could have asked Plaintiff about it at the 2005 hearing, but the ALJ failed to do so.  The ALJ's analysis of Plaintiff's neck pain treatment history does not establish any inconsistency and, thus, does not adequately support a negative inference regarding Plaintiff's credibility.  Therefore, the Court does not find the ALJ's statement that Plaintiff overstates his symptoms to be clear and convincing to the extent it is based on the finding that Plaintiff relied on chiropractic, rather than acceptable medical source, treatment for his neck pain.

*Reason Two:*

At the 2005 hearing, Plaintiff testified that he:  can stand in one place for only five to ten minutes and only if he is moving around from foot to foot; can sit 20 minutes in a comfortable chair and only five

minutes in a hard chair; and can walk for longer than he can sit or stand in one place. (A.R. 956.) Plaintiff confirmed that it is important for him to keep moving, because otherwise, he stiffens and feels pain; indeed, this is why the VA advised him to walk. (A.R. 940, 956.) Plaintiff claimed that his back pain limits his ability to work, because: he cannot bend back up if he bends down; he "can't do hardly any lifting," *i.e.,* "[f]ive pounds, maybe"; and he can only walk for a while then has to sit, but cannot sit for long and then has to get up. (A.R. 938.) Plaintiff further testified that, when he walks for five to six miles twice a day, he has to rest after approximately a mile for 20 to 30 minutes. (A.R. 939.) When he drives two hours to the VA, he has to stop halfway and walk around for ten to 15 minutes. (A.R. 940.)

As his second reason for his adverse credibility finding, the ALJ stated that Plaintiff's reported activities are inconsistent with his claimed inability to work. The ALJ noted Plaintiff's above-described March 2000 statement to a vocational evaluator that he "has the capability to work 40 hours per week in relation to the Self-Employment venture," *i.e.,* Langley Farms. (A.R. 429, *citing* A.R. 550.) The ALJ asserted that Plaintiff had represented to this same evaluator "that he farmed, harvested, treated and sold pistachios." (A.R. 429, *citing* A.R. 519.) The ALJ noted Dr. Amorim's May 2001 report, in which she states that Plaintiff "has to take care of his yard (pistachio trees) by himself." (A.R. 429, *citing* A.R. 96.) The ALJ also noted Plaintiff's previously-discussed statements to his dietician that he was walking on the farm for exercise, and asserted that Plaintiff's hearing testimony was that he "walks the lines daily to ensure that the pump drips are not clogged." (A.R. 429.) The ALJ further noted that, on September 13,

2004, Plaintiff reported to VA personnel that he was walking twice a day for five to six miles, and if he kept moving, stiffness and pain were reduced. (*Id.*, *citing* A.R. 809-10, 876.)

The ALJ's second reason is factually flawed in several respects. The ALJ's assertion that Plaintiff testified at the 2005 hearing that he presently does daily line walks to check on pump drips misstates Plaintiff's testimony, which was that he did such daily walks in the past, when he still was watering the pistachio trees. (A.R. 949.) The ALJ similarly misstates Plaintiff's statement to the vocational evaluator about farming, treating, harvesting, and selling pistachios, which was not a statement of present activity at the farm but, rather, reflected Plaintiff's plans for the future, *i.e.*, to re-start farm operations. (*See* A.R. 519.) As discussed earlier, Plaintiff testified that he stopped watering the trees in 1999 or 2000, and he had not had a nut harvest since then. (A.R. 934-36.) The ALJ's reliance on Dr. Amorim's statement that Plaintiff takes care of his pistachio trees himself is similarly unpersuasive. As also earlier discussed, Plaintiff testified that he walks among the trees to look for bugs and disease and does not "work the trees"; he further testified that he has not had a crop since he stopped watering the trees. (A.R. 932, 934, 936.)

While the remaining examples cited by the ALJ in support of the second reason are not similarly factually flawed, they are not convincing. Although Plaintiff did represent to the vocational evaluator that he had the capability to work 40 hours per week in running Langley Farms, Plaintiff explained, at the 2005 hearing, that this would consist solely of "the business stuff, you know, the writing

31

and the hiring people and stuff like that" along with walking to "check the nuts and stuff like that." (A.R. 933.) These duties are not inconsistent with Plaintiff's testimony as to his inability to sit or stand for lengthy periods and the need to alternate between sitting, standing, and walking activities, nor are they inconsistent with Plaintiff's testimony, and statements to medical personnel, about his walking abilities. These reported activities, without more, are not inconsistent with disability, as they neither demonstrate an ability to perform past relevant work nor to perform other work at the relevant exertional level.

Accordingly, Reason Two does not provide a convincing basis for the ALJ's adverse credibility finding.

*Reason Three:*

The ALJ found Plaintiff not credible on the basis that Plaintiff "is very focused on obtaining disability benefits," and his "goal to obtain disability benefits appears more motivated by financial concerns rather than physical concerns." (A.R. 429.) This reason is not only unconvincing but also, in the Court's view, inappropriate. The Court presumes that every claimant who applies for social security benefits and is denied, and who then goes through the administrative appeal process and to the length of seeking this Court's review, does so for financial reasons, *i.e.,* because he or she desires and/or needs monetary benefits. This presumptive fact does not *ipso facto* render such claimants not worthy of belief and bears no relation to whether a claimant's subjective complaints are credible. As Plaintiff aptly

observes, it is "obvious" that claimants seek Social Security disability benefits because "they need to better their financial position," and if this were a reason to find them not credible, then the SSA could disregard claimant subjective symptom testimony entirely. (Joint Stip. at 35.)  Such a result would be absurd.


D.   <u>Relief</u>


Plaintiff asserts that the Court should:  vacate the Commissioner's step one finding that Plaintiff engaged in substantial gainful activity after February 9, 1999; credit the opinions of Dr. Hang and Dr. Amorim as a matter of law; credit Plaintiff's subjective symptom testimony as a matter of law; and either award benefits or remand for further proceedings.  (Joint Stip. at 43.)

For the reasons set forth above, the Court has reversed the Commissioner's step one substantial gainful activity finding, because it is not supported by substantial evidence.  However, the Court has found that the Commissioner's treatment of the opinions of Dr. Hang and Dr. Amorim was appropriate and does not warrant reversal.  Hence, there is no basis for ordering such opinions to be credited, whether in the context of this opinion or on remand.  The Court also believes it would be inappropriate to credit Plaintiff's testimony "as a matter of law," given that the ALJ did identify one convincing basis for finding Plaintiff not credible (*to wit*, Plaintiff's claim of a right upper extremity-based limitation).

The decision whether to remand for further proceedings or order an

33

immediate award of benefits is within the district court's discretion. <u>Harman v. Apfel</u>, 211 F.3d 1172, 1175-78 (9th Cir. 2000).  Where no useful purpose would be served by further administrative proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits.  *Id.* at 1179 ("the decision of whether to remand for further proceedings turns upon the likely utility of such proceedings").  However, where there are outstanding issues that must be resolved before a determination of disability can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated, remand is appropriate.  *Id.*

The Court believes it appropriate to remand this action with the direction that the Commissioner reconsider his adverse credibility finding.  If the Commissioner still finds that Plaintiff's subjective complaints are not credible, the Commissioner must state appropriate and sufficient reasons for finding them to be not credible.  If, instead, the Commissioner finds Plaintiff credible in this respect, the Commissioner must accept Plaintiff's testimony and repeated the step three RFC analysis in light of the effect of Plaintiff's subjective limitations.  Depending on the outcome of this reassessment, this may in turn necessitate a reevaluation of the finding that Plaintiff can perform his past relevant work,[10] possible further VE testimony, and/or application of the Grids.  *See* <u>Dodrill v. Shalala</u>, 12 F.3d 915, 917-18

---

[10]    As set forth above, the Court has not disturbed the Commissioner's past relevant work finding based on the present state of the record.  However, depending on the outcome of the ordered further proceedings in this case, it may be that a reevaluation of the step four finding is required.

(9th Cir. 1993)(after finding, *inter alia*, a credibility assessment to be defective, remanding for a repeat of the step four analysis and an articulation of specific finding for rejecting the claimant's pain testimony).

**CONCLUSION**

Accordingly, for the reasons stated above, IT IS ORDERED that the decision of the Commissioner is REVERSED, and this case is REMANDED for further proceedings consistent with this Memorandum Opinion and Order.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for plaintiff and for defendant.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: March 28, 2008

```
                                    /s/
                          MARGARET A. NAGLE
                  UNITED STATES MAGISTRATE JUDGE
```

35